IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 20-cr-10016-LTS |
| | ) | |
| HASSAN ABBAS, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S TRIAL BRIEF

On January 21, 2020, a Grand Jury returned an Indictment charging the defendant, Hassan Abbas, a Belgian and Lebanese national and a licensed Illinois attorney, with one count of money laundering and two counts of unlawful monetary transactions, in connection with a scheme to use shell companies and bank accounts controlled by Abbas to receive and launder proceeds from victims of unlawful "business email compromises" ("BECs")[1] and "romance scams."[2]  Dkt. 1.  On November 3, 2020, the Grand Jury returned a Superseding Indictment adding two counts of wire fraud.  Dkt. 66. On October 21, 2021, the Grand Jury returned a Second Superseding Indictment adding one count of conspiracy to commit money laundering and unlawful monetary transactions relating to the Indictment's existing allegations.  Dkt. 102.  The trial is scheduled to begin on May 3, 2022 and is expected to last two to three weeks assuming the current schedule remains in place.  Dkt. 211, 212.

---

[1] As set forth in the Second Superseding Indictment, BECs refer to a type of fraud that typically targets companies that conduct wire transfers.  In a BEC scam, individuals send emails that appear to come from a colleague, vendor, or business associate of victims.  The emails routinely direct victims to send money to an account or accounts that do not belong to the intended recipient.

[2] Romance scams refer to a type of fraud that uses fictitious profiles on online dating or social websites to gain the trust of victims, who are eventually directed to send funds to an individual they believe they are in a relationship with.  Both romance scams and BECs frequently employ the use of "spoofed" emails that appear to originate from legitimate businesses or banking institutions.

### Background

The Second Superseding Indictment outlines Abbas's role in a conspiracy and scheme to defraud victims of BECs and romance scams into wiring funds to various bank accounts he controlled, in or about and between June 2017 and January 2019.  Abbas organized sham companies solely for the purposes of receiving and laundering funds from victims around the country, including victims in Massachusetts.  He then opened and maintained bank accounts in the names of those companies with various banks.  Victims were deceived into sending money to those bank accounts through romance scams, BECs, and other scams.  After receiving funds, Abbas generally wired the funds to personal accounts he controlled or to foreign corporations.  As victim funds flooded his various accounts, Abbas brazenly used his law license as both a sword and a shield.  When confronted by banks about his receipt of fraud proceeds, Abbas variously claimed that the proceeds were "from the sale of bonds" or that they otherwise represented payments relating to his "clients"—the shell companies that Abbas incorporated and controlled.  Abbas also at times refused to provide any information to the banks.

Count One of the Second Superseding Indictment is based on transfers initiated by Victims 2 and 3, who in August 2017 were in the process of purchasing a home.  After receiving a spoofed email containing closing instructions from someone impersonating their real estate attorney, Victims 2 and 3 wired a down payment in the amount of $30,427 to a PNC Bank account that Abbas had opened one month prior in the name of a company that Abbas had formed one month prior, Phoenicia Trust, Ltd. ("Phoenicia Trust").  As charged in Count Three, two days later, Abbas wired $7,500 from that PNC Bank account to another PNC Bank account he held in his own name.  The wire from Victims 2 and 3 was recalled the next day.

Count Two relates to transfers initiated by Victim 7, who in late 2018 communicated with an individual purporting to be "James Deere," whom she met on an online dating site.  Deere pretended to be a wealthy widower and convinced Victim 7 to wire $111,000 from her bank account to a U.S.

Bank account that Abbas opened in the name of Sparta Gijon, Inc. ("Sparta"), another company that Abbas organized and controlled. As charged in Counts Four and Five, Abbas subsequently wired $82,500 from Sparta's U.S. Bank account to TCL Air Conditioner, Zhongshan Co., which appears to be a Chinese company. He also transferred $39,200 from the same account to his personal account at TD Bank.

Count Six charges Abbas with a conspiracy to conduct unlawful monetary transactions and to launder the proceeds of wire fraud based on the allegations that form the bases for Counts Three, Four, and Five.

<u>**Evidence**</u>

The following is a summary of certain key forms of evidence the government currently anticipates offering in its case-in-chief, along with related issues. The government reserves the right to supplement or modify its evidence as it continues to prepare for trial.

### A. Victim Witnesses

The government may call certain victims of BECs and romance scams who wired money to bank accounts controlled by Abbas. The victims are expected to testify about the circumstances that led to their transfers of funds to Abbas-controlled accounts. Through these witnesses, the government expects to introduce communications from the perpetrators of the BECs and/or romance scams, as well as testimony about victims' efforts to recall funds that they had sent to accounts controlled by Abbas.

### B. Bank Employee Witnesses

The government may call certain employees of banks with which Abbas maintained accounts used in furtherance of the scheme. For example, the government may call bank employees who are expected to testify that they notified Abbas that one or more wires into his account had been reported

to be fraudulent and that the bank accordingly intended to close the account.  The government also may call bank employees to testify about statements Abbas made to them about the fraudulent wires.

### C.  Law Enforcement Witnesses

The government expects to call Special Agent Andrea Sciolino of the Federal Bureau of Investigation ("FBI") to introduce various records, including public records, bank records, other business records, and search warrant returns from an account used to communicate with victims.  The special agent may also testify regarding BECs and romance schemes, common tactics used to implement such schemes, and common methods of laundering proceeds from such schemes, including the use of shell corporations.

The government also expects to call an officer from U.S. Customs and Border Protection ("CBP") to testify about statements made by Abbas during a January 2018 secondary screening at Chicago O'Hare International Airport, as well as to introduce certain documents found on Abbas's person at the time of that screening.  The government reserves the right to call additional law enforcement witnesses.

### D.  Other Records and Potential Witnesses

In the absence of a stipulation, the government will need to call a witness from the Federal Reserve Bank of New York to establish that the wires charged in the Second Superseding Indictment, which were both sent through the Fedwire transfer system, traveled interstate.  The government has provided the defendant with a report detailing the anticipated testimony of a Federal Reserve Bank witness, confirming both charged wires traveled in interstate commerce.  The government has not yet received a response as to whether the defendant intends to stipulate to the interstate wire.

The government expects to call a witness from the Internal Revenue Service ("IRS"), who will testify that none of the shell companies that Abbas used in furtherance of the scheme filed tax returns.

Additionally, the government expects to call a witness who will testify about Abbas's relationship with her elderly mother, whom Abbas listed as a corporate secretary on official documents for one of his shell companies, and whom Abbas directed to make certain deposits into bank accounts that he controlled.

### E.  Summary Witness

The government intends to call FBI Forensic Accountant John Harger to summarize information contained in documents introduced into evidence throughout the trial, including hundreds of pages of bank records for accounts held by or associated with Abbas.  The government requests the Court's permission for Mr. Harger to be present in the courtroom for other witnesses' testimony throughout the trial, which would allow him to more efficiently summarize evidence introduced prior to his testimony.

### F.  Potential Expert

With the Court's permission, the government may call Professor Samuel Manella, of DePaul University, as an expert in legal ethics and professional responsibility in Illinois, the state in which Abbas is a licensed attorney.  From 1985 to 1991, Professor Manella was counsel to the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois ("ARDC"), the administrative body responsible for investigating and prosecuting attorney disciplinary cases in Illinois. In that role, Professor Manella investigated and prosecuted allegations of professional misconduct against lawyers before various boards and the Illinois Supreme Court.  In private practice since 1991, Professor Manella has represented attorneys in professional responsibility and disciplinary proceedings before the ARDC and the Supreme Court of Illinois.  He also has provided expert opinions and testimony in matters involving attorney ethics, including at trial.

The government anticipates that Professor Manella will testify about rules governing the practice of law in Illinois, including requirements with respect to an attorney's holding of client funds

and rules prohibiting a lawyer from assisting a client in conduct the lawyer knows or should reasonably know to be criminal or fraudulent.

## Legal Issues

### A. Use of Intrinsic Evidence

The charged counts in the Second Superseding Indictment relate to fraud proceeds that Abbas received from Victims 2 and 3 and Victim 7. The government previously provided the defense with notice that it intends to introduce documentary evidence and elicit testimony regarding transactions involving the other victims identified in the Second Superseding Indictment (Victims 1, 4, 5 and 6 and Victim Companies 1 through 4). The government also provided the defense with notice that it intends to introduce documentary evidence and elicit testimony from a Lakeside Bank witness concerning communications with the defendant with regard to a wire sent to the defendant's bank account held in the name of EP Minerals, LLC, another entity incorporated by Abbas.

It is well settled that evidence of other acts that is "intrinsic to the crime for which the defendant is on trial" is admissible without regard for the requirements of Federal Rule of Evidence 404(b). *United States v. Epstein,* F.3d 431, 439 (1st Cir. 2005); *United States v. Encarnacion*, 26 F.4th 490, 507 (1st Cir. 2022) ("when evidence is intrinsic to elements of a charged offense, Rule 404(b) is simply not implicated"). By its very terms, Rule 404(b) "excludes only extrinsic evidence—evidence of other crimes, wrongs, or acts—whose probative value exclusively depends upon a forbidden inference of criminal propensity." *Epstein at* 439. In contrast, the rule does not apply to evidence—such as the evidence the government seeks to introduce in this case—which is "necessary to complete the story of the charged crime." *United States v. Taylor*, 284 F.3d 95, 101 (1st Cir. 2002).

Testimony and evidence establishing Abbas's receipt of funds from these additional victims are intrinsic to the charges contained in the indictment and the Court should admit them. Each of these additional victims transferred funds to an account controlled by Abbas as a result of a scam.

Like Victims 2 and 3, Victims 1, 4, and 5 transferred funds to accounts controlled by Abbas under the fraudulent impression that they were completing wire transfers in connection with purchasing homes.  Like Victim 7, Victim 6 sent money to accounts under Abbas's control at the direction of an individual who cultivated her trust using a fictitious online profile.  Victim Companies 1 through 4 all wired funds to Abbas's accounts in response to spoofed emails that purported to be from a vendor or client.

Intrinsic evidence includes prior acts that are "part of [the] necessary description of the events leading up to the crime or that help prove an element of a charged offense."  *United States v. Fazal–Ur–Raheman–Fazal*, 355 F.3d 40, 50 (1st Cir.2004).  With respect to Victims 2 and 3, who wired funds to a PNC Bank account in the name of Phoenicia Trust in August 2017, such evidence includes the contemporaneous transfers of funds from Victim 4 to the same PNC Bank account and from Victim 5 to a Phoenicia Trust account at another and the recalls of those funds, as well as the receipt by another Phoenicia Trust account, at a different bank, of funds from Victim 6 in December 2017.  These events demonstrate that Abbas received other funds directed to Phoenicia Trust, that those transfers were also the subject of recalls and/or wire reversals; and that Abbas continued to receive funds in the name of Phoenicia Trust, even after PNC Bank and another bank both notified Abbas that the wires from Victims 2 and 3, Victim 4, and Victim 5 had been reported as fraudulent and that those banks were closing Phoenicia Trust's accounts.

The other uncharged victim transactions are similarly "part and parcel" of the broader fraudulent scheme and conspiracy to launder money, and they are admissible.  *United States v. Nivica*, 887 F.2d 1110, 1119 (1st Cir. 1989).  *See also, United States v. Santagata*, 924 F.2d 391 (1st Cir.1991) (holding that in a telephone order scheme the district court properly admitted evidence of "of more than fifty orders …not just … the fourteen orders charged in the indictment.); *United States v. McGauley*, 279 F.3d 62 (1st Cir.2002) (finding district court properly permitted evidence of two

7

hundred seventeen fraudulent refund checks despite only three counts of mail fraud as proof that the checks were "part of a broader scheme to defraud retail establishments").  The context that these transactions provide is "necessary to complete the story of the charged crime" because the transactions demonstrate that the charged crimes were not standalone episodes that could have been the result of an accident.

No further analysis is necessary.  But, in the alternative, each category of evidence is also admissible pursuant to Federal Rule of Evidence 404(b) to show the defendant's motive, intent, knowledge, and absence of mistake.  *See United States v. Green*, 698 F.3d 48, 55 (1st Cir. 2012).  Specifically, the fact that Abbas received proceeds from other fraud victims into accounts he controlled, in the names of various entities that he created, is evidence that he knew that these inflows were the proceeds of fraud, that he intended to use these entities and bank accounts to receive fraud proceeds, and that it was no mistake that he received and transferred the funds that were fraudulently obtained from Victims 2 and 3 and Victim 7.  The probative value of evidence of these other transactions is not outweighed by any unfair prejudice to Abbas.  Put simply, these other transactions involve the same type of activity as the charged transactions—the receipt of fraud proceeds into accounts controlled by Abbas and the subsequent transfers of those proceeds.  *See, e.g., United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir 1990) (in prosecution for conspiracy to distribute drugs, evidence of defendant's prior drug dealing with co-conspirator was not unduly prejudicial insofar as it "did not involve conduct any more sensational or disturbing than the crimes" charged).

### B.  Introduction of Business Records and Public Records

The government intends to introduce certain business records, including bank account records, under Fed. R. Evid. 803(6) and 902(11).  As is required by Fed. R. Evid. 902(11), the government provided counsel for the defendant with copies of these records and copies of certifications obtained pursuant to Fed. R. Evid. 902(11).  The government has provided the defendant with notice of the

government's intent to introduce the exhibits without the need for the testimony of a records custodian and has asked for the defendant's assent.

The government also requested the defendant's stipulation to the records' admissibility. Business records may be admissible as self-authenticating, non-hearsay evidence "if certified according to Fed. R. Evid. 902(11). *See Federal Trade Comm. v. Direct Marketing Concepts, Inc*., 624 F.3d 1, 16 (1st Cir. 2010). Rule 902(11) provides for the admissibility of "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court." Fed. R. Evid. 902(11). The declaration under rule 902(11) must establish that:

> (A) the record was made at or near the time by—or from information transmitted by— someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]
>
> (C) making the record was a regular practice of that activity ....

Fed. R. Evid. 803(6). The court should admit the offered records as business records under rule 803(6) that are properly certified as authentic copies of domestic records under 902(11). Because these records were created automatically in the ordinary course of their business operations, and not created for the purpose of this prosecution, their admission without a live witness does not present Confrontation Clause issues of the type underlying the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). *See United States v. Cameron*, 699 F.3d 621, 641-42 (1st Cir. 2012) (Yahoo! and Google subscriber records not created for the purpose of the prosecution are non-testimonial). The underlying records are accordingly admissible pursuant to Fed. R. Evid. 803(6) and

902(11).  *See also Crawford*, 541 U.S. at 56 (noting that business records are non-testimonial "by their nature").

The government also intends to introduce certain public records, including incorporation records, under Fed. R. Evid. 803(8).  Rule 803(8) provides an exception to the hearsay rule for public records from a public agency or office, relating to an activity of the office. "Records kept … [b]y public agencies may be admissible under the business records exception, Fed. R. Evid. 803(6), as well as under the public records exception, Fed. R. Evid. 803(8)."  *United States v. Bohrer*, 807 F.2d 159, 162 (10th Cir. 1986) (internal citations omitted).

### C.  Statements of the Defendant

The government expects to elicit witness testimony regarding Abbas's statements to bank employees and/or other individuals.  These statements are not hearsay when offered by the government against Abbas.  *See* Fed. R. Evid. 801(d)(2).

Abbas's prior statements remain inadmissible hearsay when offered by the defense.  *See United States v. Rivera-Hernandez*, 497 F.3d 71, 80 (1st Cir. 2007) (citing Fed. R. Evid. 801, 802); *see also, United States v. Palow*, 777 F.2d 52,56 (1st Cir. 1985) (holding that Rule 801(d)(2)(A) was "designed to exclude the introduction of self-serving statements by the party making them").  Indeed, the defense is not permitted to circumvent this rule by eliciting the Abbas's statements through the cross-examination of other witnesses.  *United States v. Bauzo-Santiago*, 49 F. Supp. 3d 155, 157 (D.P.R. 2014) (prohibiting defendant from eliciting defendant's "out-of-court statement during cross-examination of government witnesses to impeach the witnesses") (citing *Bemis v. Edwards,* 45 F.3d 1369, 1372 (9th Cir. 1995) and *United States v. Hudson,* 970 F.2d 948, 956 (1st Cir. 1992)).

### D.  Use of Documents Authored by Law Enforcement to Impeach Witnesses

The defense should not be permitted to use documents authored by law enforcement, including but not limited to summaries of witness interviews commonly referred to as "302s" or "MOIs," to

impeach interviewees on the basis of inconsistent statements if they are called by the government as witnesses at trial.  Witnesses may only be impeached with their own prior statements, and law enforcement interview summaries are not the statements of the witnesses themselves.  The Supreme Court has recognized that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo v. United States*, 360 U.S. 343, 350 (1959).

The defense should be limited to using the interview summaries in a manner that does not lead the jury to believe that the interview summaries are the witnesses' prior statements.   To allow otherwise would subvert the meaning of the Jencks Act and the Supreme Court's decision in *Palermo*. The defense may ask a witness whether he or she made a statement reflected in an interview summary. However, if the defense is not satisfied with the witness's answer, the defense should not be allowed to suggest to the witness or to the jury that the interview summary is the witness's prior statement or to publish or to introduce the contents of the interview summary as a prior inconsistent statement, absent a showing that the witness adopted the interview summary as his or her statement.

### E.  Suspicious Activity Reports (SARS)

The government previously briefed issues relating to the disclosure of Suspicious Activity Reports ("SARs") or the existence of SARs.  Dkt. 152.  Producing or confirming the existence of SARs is prohibited by law. 31 U.S.C. § 5318(g)(2)(A)(ii); 12 C.F.R. § 21.11(k).  At trial, the defense should not seek to elicit testimony relating to the filing of any SAR or any decision not to file a SAR.

## **Other Matters**

### **A. Electronic Presentation of Evidence**

The government intends to present its evidence in electronic format using Trial Director. The government anticipates that Allison Freitas, a paralegal with the U.S. Attorney's Office, will operate Trial Director and will also be available to assist defense counsel with the presentation of government exhibits.

### **B. Summary Charts**

Three types of summaries and charts are typically used in criminal cases: (1) summaries of voluminous records which may be admissible pursuant to Fed. R. Evid. 1006; (2) summaries created by a witness which may be admitted pursuant to Fed. R. Evid. 611(a); and (3) demonstratives or pedagogical charts that are used as testimonial aids, but which are not themselves introduced into evidence. The government may seek to use summaries and charts falling within all three categories.

### **i.      Fed. R. Evid. 1006 Summary Schedules**

Federal Rule of Evidence 1006 allows the "contents of voluminous writings . . . which cannot conveniently be examined in court [to] be presented in the form of a chart, summary, or calculation." *See* Fed. R. Evid. 1006; *United States v. Milkiewicz*, 470 F.3d 390, 396 (1st Cir. 2006).. The proponent must show that the voluminous source materials are what the proponent claims them to be, and that the summary accurately summarizes the source materials. *Milkiewicz*, 470 F.3d at 396.

The government will offer into evidence summaries of bank account records of Abbas and his shell companies. The bank record summaries will be offered through FBI Forensic Accountant John Harger, who reviewed and summarized the bank account records. The records on which the summaries are based are routinely kept in the normal course of business and fall within the hearsay exception of Rule 803(6). The underlying records have been made available to the defense and will be offered into evidence.

### ii.    Fed. R. Evid. 611(a) Summary Testimony and Schedules

Federal Rule of Evidence 611, addressing the Mode and Order of the Interrogation of Witnesses, gives the Court great discretion in what a witness may use during testimony so as to "(1) make the presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time."  Fed. R. Evid. 611(a); *see Milkiewicz*, 470 F.3d at 396 (explaining that a trial judge may allow use of a chart or other summary tool under Rule 611(a)).  Such summaries are typically used to clarify and simplify complex information or to assist counsel in the presentation of argument to the court jury.  *Id.* (quoting *United States v. Bray,* 139 F.3d 1104, 1111 (6th Cir. 1998)).

In the event the summaries described in the above section are not considered to summarize voluminous records under Rule 1006, they should be admissible under Rule 611.  Such summaries themselves can also be properly admitted into evidence.  *See Milkiewicz*, 470 F.3d at 398 (noting that such "pedagogical devices may be sufficiently accurate and reliably that they, too, are admissible in evidence, even though they do not meet the specific requirements of Rule 1006").  *See also, United States v. McElroy,* 587 F.3d 73, 92 (1st Cir. 2009)(upholding the trial court's admission of summary charts and summary testimony under Rule 1006 and 611(a)).

### iii.    Demonstrative Charts

The government may also use various demonstrative charts during its opening statement, examination of witnesses, and in closing argument.  Such charts include, for example, diagrams showing the flow of the fraud proceeds.  The government does not intend to offer these charts into evidence.  Courts have repeatedly allowed use of charts similar to those the United States intends to use in this case. *See, e.g., United States v. Scales*, 594 F.2d 558, 561-562 (6th Cir. 1979) (summary of indictment); *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir. 1985) (simple flow charts tracing the defendant's use of loan proceeds).

**<u>Conclusion</u>**

The United States respectfully reserves the right to address legal and evidentiary issues

that may arise during the course of trial and to call additional witnesses not specified in this brief.

Respectfully Submitted,

RACHAEL S. ROLLINS
U.S. ATTORNEY


By:    /s/ *Mackenzie Queenin*
       Mackenzie A. Queenin
       David M. Holcomb
       Assistant United States Attorneys
       U.S. Attorney's Office
       One Courthouse Way
       Boston, MA 02210

**Certificate of Service**

I, Mackenzie A. Queenin, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").


Date: <u>April 19, 2022</u>                                  <u>/s/ Mackenzie A. Queenin</u>
                                                                           Mackenzie A. Queenin