UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>) | Crim. No. 20-10016-LTS |
| v. ) )<br>) )<br>HASSAN ABBAS ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

From at least 2017 through 2019, Hassan Abbas exploited his law degree, peddled falsehoods about business dealings, and invoked the attorney-client privilege—perhaps the most sacred principle governing the legal profession—for his personal gain. The evidence at trial established that Abbas was adept at moving dirty money and concealing his criminal involvement. The proof at trial also underscored that real victims—individuals and businesses, young and old, of varying means—supplied the funds that Abbas sent to fellow fraudsters overseas and used to fund his international lifestyle. Notwithstanding his conviction by a jury of his peers, Abbas's failure to accept responsibility for his pernicious conduct remains strident. He fails to acknowledge that these victims' losses were more than just merely incidental to his activity. But they were the objectives of the criminal schemes that he willfully joined, and his rejection of any degree of responsibility for them defies both the evidence at trial and human sympathy.

A significant sentence is necessary to deter others inclined to participate in business email compromises ("BECs") and similar online schemes, and especially to deter lawyers and others with specialized skills from using those advantages as a cover to repeatedly break the law and victimize others. For Abbas's actions, the government requests that the Court impose the following sentence: incarceration of 108 months, three years of supervised release, restitution in

the amount of $2,001,853.68, forfeiture in the amount of $2,001,853.68, and a $600 special assessment.

I.     THE OFFENSE AND RELEVANT CONDUCT

Following extensive pre-trial litigation and a six-day jury trial, the Court is by now familiar with the facts of the case. *See generally* Presentence Investigation Report (PSR) ¶¶ 6-66. Cloaked in the deference afforded to him based on his status as an attorney, Abbas received money from unwitting victims, took a cut for himself, moved money overseas, and attempted to dupe the financial institutions who asked questions to avoid getting caught. Abbas was convicted of all counts with which he was charged: wire fraud (18 U.S.C. § 1343, Counts One and Two), money laundering (18 U.S.C. § 1956(a)(1)(B)(i)), Count Three), unlawful monetary transactions (18 U.S.C. § 1957, Counts Four and Five), and money laundering conspiracy (18 U.S.C. § 1956(h), Count Six).[1]

Beyond the evidence presented at trial, the government's statement of offense conduct also provides information concerning additional victims that transferred money to Abbas's sham corporate accounts, along with interview/investigative reports pertaining to those victims.[2] *See* PSR, at ¶¶ 20, 22-24, 44-45, 49-51, 55-56, 63-66.[3]   Section 1B1.3 of the U.S. Sentencing

---

[1] Abbas was acquitted on the money laundering object of the conspiracy charge but convicted on the unlawful monetary transactions object of the conspiracy. Dkt. 311.

[2] The reports were previously provided to the defendant in discovery.

[3] Although the government did not call victim 6703663, victim 6592566, or a representative from victim companies 6591827, 6968575, and 6968576, evidence concerning their transfers into Abbas's accounts was presented through the testimony of former Lakeside Bank employee Ana Benitez and FBI Financial Analyst John Harger. *See* Trial Tr. Day 4, 52:22, 59:5-12; Trial Tr. Day 5, 39:18, 47:6.

Guidelines ("U.S.S.G.") specifically states that the relevant Guidelines calculation must include any applicable relevant conduct. Abbas's fraud against these additional individuals and companies made up parts of the same course of conduct and common scheme as the fraud counts on which he was convicted: Abbas received these victims' fraudulently induced payments with bank accounts that he opened, in the name of the same set of corporate entities that he incorporated and controlled, during the same time in which he committed the charged instances of fraud. *See* U.S.S.G. § 1B1.3(a)(2); Declaration of John Harger in Support of Government's Motion for Forfeiture, p. 3. These victims' losses therefore properly factor into the relevant conduct analysis.

## II. THE GUIDELINE SENTENCING RANGE

The government agrees with the United States Probation Office's calculation of the Sentencing Guidelines set forth in the final PSR. The PSR correctly calculates the applicable total offense level of 31. PSR ¶84. Abbas raises various objections in an attempt to dramatically deflate his total offense level to 9. Each of his objections should be overruled.[4]

### A. The Applicable Loss Amount Results in a 16 Level Increase

Section 2B1.1(b)(1) of the Sentencing Guidelines governs loss amount. Generally, loss is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment., n. 3. Loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment., n. 3(A)(i). The Court need only make a reasonable estimate of the loss, based on available information. U.S.S.G. § 2B1.1, comment., n. 3(C). Abbas argues that because the jury acquitted him with respect to a portion of the money laundering conspiracy, "all loss related to the

---

[4] In his PSR Objections, Abbas previews arguments that he plans to make on appeal. These arguments do not support an alternative Guidelines calculation. The Court previously denied Abbas's Rule 29 motion and motion for a new trial, in which he advanced these same arguments. Dkt. 330.

money laundering conspiracy must be excluded from the guideline calculation." Abbas PSR Objections, at 2. In so arguing, Abbas sweeps aside the relevant conduct analysis discussed above, which holds him to account for his role in instances of fraud that were not specifically charged but that fall squarely within the course of criminal conduct in which Abbas engaged. *See* U.S.S.G § 1B1.3(a)(1). Accordingly, Abbas's loss amount must include the losses to the other victims that he defrauded.

### B. A Two-Level Enhancement for Sophisticated Means Applies

Contrary to Abbas's assertion, the enhancement for sophisticated means applies. U.S.S.G. §2B1.1(b)(10)(C); PSR at ¶75. The Application Note to the Guidelines defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, App. Note 9. Several examples of conduct constituting sophisticated means are included in the notes, including conduct that is identical to Abbas's. The Guidelines state "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1(b)(2) cmt. n.9(B). This example and other examples provided however, are not the only types of cases where the enhancement can apply. *United States v. Kitts*, 27 F.4th 777, 790 (1st Cir. 2022) (finding enhancement warranted based on unauthorized use of client's signature and creating a fake company, and collecting cases); *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (upholding application of the sophisticated means enhancement where the defendant "set up multiple corporate entities in order to facilitate his fraudulent schemes"); *U.S. v. Conner*, 537 F.3d 480, 491 (5th Cir. 2008) (using fake IDs to purchase goods then resold on eBay was "not the most sophisticated fraud" but qualified for the sophisticated means enhancement).

The First Circuit has recognized that sophisticated means may apply even where the conduct is *less* sophisticated than the examples in the Application Note. *United States v. Doley*, 783 F.3d 7, 25 (1st Cir. 2015). Moreover, a "scheme may be sophisticated even if the individual elements taken alone are not." *Id.* (citing *United States v. Evano*, 553 F.3d 109, 113, (1st Cir. 2009)). The evidence at trial and the language of the notes in the Guidelines clearly establish that Abbas personally participated in conduct constituting sophisticated means.[5] He incorporated numerous shell corporations with no legitimate business purposes.[6] He then opened bank accounts using the names of the corporate entities. He did so because unknowing victims engaging in a business or real estate transaction would not necessarily flag a domestic corporate account provided by their purported real estate broker or business partner as "suspicious", thereinafter enabling the funds to be transferred to their ultimate destination, foreign bank accounts. *See* Trial Tr. Day 4, 208:1-16.

Moreover, even in the event the Court found that the sophisticated means enhancement did not apply, then the enhancement set forth in subsection §2B1.1(b)(10)(B) would apply because a substantial portion of the scheme occurred outside of the United States. The defendant does not need to "personally take action from outside of the United States for the enhancement to apply"; instead, it is sufficient for the defendant's co-conspirators, even if they remain unidentified, to act

---

[5] The offense involved other sophisticated conduct, although examining that broader conduct is not necessary in light of Abbas's personal participation in opening bank accounts in the name of sham entities he incorporated. Numerous victims testified about their receipt of "spoofed" emails that contained various false pretenses, for example, that the sender was looking for a romantic relationship or that the sender was involved in a business transaction.

[6] Specifically, Abbas incorporated the following entities: Phoenicia Trust, Ltd., Sparta Gijon, Inc., Midamines Sprl, Ltd., Katchi, Inc., and EPMinerals, LLC. He also incorporated Sarah Eshel, Inc., which received some of his fraud proceeds.

from abroad. *United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002) (finding the enhancement to apply in a "call sell" scheme where unidentified co-conspirators clearly took part in the scheme from abroad). Here, not only did Abbas ultimately transfer a portion of the victim proceeds abroad (after taking his own cut), but the government presented evidence that the user of the "jamesdeere" account that emailed victim 6194979 was located in Nigeria. FBI Analyst John Harger also testified about wire transfers overseas. *See*, *e.g.*, Trial Tr. Day 5, 65:3-12. On these facts, the Court should find that a substantial part of the scheme occurred abroad.

### C. The Enhancement For 10 or More Victims Applies

Abbas also objects to the plainly applicable enhancement for 10 or more victims under §2B1.1(b)(2)(A)(iii) because "the counts of conviction involved three victims." *See* PSR at ¶ 74. Abbas again flatly ignores the import of the principles governing relevant conduct in evaluating his applicable Guidelines. U.S.S.G. § 1B1.3(a)(1). The PSR outlines that Abbas's sham accounts received funds from over 10 victims. *See* PSR, at ¶66. Indeed, the entire purpose of opening bank accounts in the name of sham entities was to receive unwitting victims' funds, as evidenced in part by the lack of other legitimate activity in the accounts.

Moreover, even in the event there were not 10 or more victims, then an enhancement for substantial financial hardship would apply to one or more victims. U.S.S.G. §2B1.1(b)(2)(A)(iii). For example, victim 6194979 suffered a substantial loss of a retirement and/or savings fund based on the funds she wired to Abbas and Abbas's co-conspirator's accounts. *See* Trial Tr. Day 4, 110:7-112:17. Her victim impact statement heartbreakingly describes how this crime has impacted her life and financial position.

### D. The Enhancement for Sophisticated Laundering Applies

As with each of the other enhancements, Abbas objects to the application of an enhancement for sophisticated laundering pursuant to U.S.S.G. §2B1.1(b)(3). *See* PSR at ¶75; Abbas Objections to PSR, at p. 3. The application note for this enhancement explains that sophisticated laundering "means complex or intricate offense conduct pertaining to the execution or concealment of the [§ 1956] offense," and "typically involves the use of: (i) fictious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transfers, or transmission, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." U.S.S.G. § 2S1.1 cmt. n.5(A)(i)-(iv). Contrary to his objection, Abbas's own conduct involved each of these categories.

The trial evidence demonstrated that Abbas used multiple shell corporations and/or fictitious entities—the sham businesses that he registered—to open business bank accounts to receive and launder the fraud proceeds to individuals abroad. *See* PSR at ¶¶6-66. He also transferred large sums of fraud proceeds between accounts that he controlled. *See* GX 187 (summarizing a subset of transfers between accounts). Indeed, the entire purpose of Abbas's role in the conspiracy was to move the ill-gotten funds in a way that did not raise undue suspicion with either the victims or the banks, and to move the funds abroad before the victims could recall the wires. The enhancement clearly applies.

### E. Abbas is Not Entitled to Any Reduction for Acceptance of Responsibility or for His Allegedly Minimal Role

Abbas should receive no reduction in his applicable Guidelines for his purported acceptance of responsibility since he "focused his defense at trial on the *mens rea* element." Abbas Objections to PSR, at p. 3. Mens rea is one of the "essential factual elements of guilt" that Abbas needed to acknowledge in order to merit any reduction. *United States v. Mikutowicz*, 365 F.3d 65,

7

75-78 (1st Cir. 2004) (finding that trial court erred in granting a two-level reduction to defendant who proceeded to trial to contest willfulness); *see also United States v. Crass*, 50 F.3d 81, 84 (1st Cir. 1995) ("intent, like any other essential element of the crime charged, may not be contested without jeopardizing a downward adjustment for acceptance of responsibility"). "The defendant who opts to go to trial rather than negotiating a plea runs the risk of a harsher sentence than he would have received by pleading guilty." *United States v. Quejada-Zurique*, 708 F.2d 857, 861 (1st Cir. 1983); *accord United States v. Rosario-Peralta*, 199 F.3d 552, 570 (1st Cir. 1999) (framing the relevant issue as granting defendants who accept responsibility and express remorse as "special leniency," rather than subjecting defendants who do not accept responsibility to harsher punishment); *United States v. Torres Santiago*, 729 F.2d 38, 40–41 (1st Cir. 1984) (same). Far from merely exercising his Constitutionally protected right to a trial by a jury, Abbas continues to deny responsibility and attempts to falsely minimize his culpability. By any measure, he has utterly failed to accept any degree of responsibility for his actions.

Nor can he credibly claim that he is entitled to a minimal role reduction, when he played a critical role in receiving and transferring victim funds. *See, e.g.*, Trial Tr. Day 4, 208:6-10 (testimony of FBI Special Agent Kelly Bell) ("[I]f the legitimate transaction was happening in the United States, then it wouldn't make sense to the people participating in that transaction that they were sending money directly overseas. So when the fraudsters redirect the money, they direct it to an account within the United States."). Abbas seems to suggest that, because he did not object to Bank of America returning funds to a victim on a single occasion, *after* the bank was made aware of fraud associated with his account, the Court should view him as less culpable in the fraud scheme. Abbas Objections to PSR, at p. 3. He does so despite the numerous instances in which he deceived banks (including Bank America) or otherwise refused to cooperate in order to conceal

8

his involvement in the scheme. *See* Trial Tr. Day 2, 142:9-11, 144:4-5, 194:16-23 (testimony of PNC Bank employee Joe Vavruska, that Abbas stated that wires were for the sale of bonds and that Abbas stated that attempted wire to company in China was for the purchase of electronics); Trial Tr. Day 3, 142:17-25 (testimony of Bank of America employee Barry Roessler, that Abbas said that he was expecting the wire and that he would contact the sender of the wire, before ultimately assenting to the bank's reversal of the wire); *Id.*, 41:14-17 (testimony of First Midwest Bank employee Brad Warren, that Abbas stated that he was a lawyer, that the wires were for clients, and that information about the wires was attorney-client privileged); Trial Tr. Day 4, 62:7-15 (testimony of Lakeside Bank employee Ana Benitez, that Abbas refused to provide any documents or information about the wire's origin and purpose). The evidence at trial refuted each of these misrepresentations and underscored his role with respect to the fraud and his reward for playing this role. *See*, *e.g.*, GX 188 (summarizing over $1.6 million in transfers Abbas made to overseas bank accounts); GX 170-192 (highlighting numerous transfers to himself and his family, cash withdrawals, and personal expenditures). The assertion that Abbas was "plainly among the least culpable of those involved" or that he somehow "lacked knowledge of the structure of the enterprise," as is required to apply a minimal role adjustment, has no support in the record before this Court. *See* U.S.S.G. § 3B1.2, comment 4. Abbas's request for a minimal role adjustment merits no further response.

### III. SENTENCING RECCOMENDATION

The government's recommended sentence—incarceration at the low end of the Guidelines—is a reasonable and just outcome that is sufficient but not greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a) for this defendant.

**A. The Nature and Circumstances of the Offense Warrant a Sentence of 108 Months**

BEC schemes represent a growing percentage of financial crimes, particularly for transnational criminal organizations that target victims in the United States and elsewhere. The FBI's 2022 IC3[7] report warned that from June 2016-December 2021, the reported global cost of BEC attacks was a staggering **$43 billion**. *See* BUSINESS EMAIL COMPROMISE: THE $43 BILLION SCAM (MAY 4, 2022), *available at:* https://www.ic3.gov/Media/Y2022/PSA220504. This type of crime shows no sign of abating. Between July 2019 and December 2021, there was a 65% increase in identified global exposed losses.[8] The FBI notes that the increase "can be partly attributed to the restrictions placed on normal business practices during the COVID-19 pandemic, which caused more workplaces and individuals to conduct routine business virtually." *Id.*

The nature of this offense is also distinguishable from a run of the mill fraud for other reasons. Abbas hid behind his law license to enrich himself and his co-conspirators abroad by laundering money for purported clients. While financial institutions are subject to a sophisticated web of regulations meant to detect and deter money laundering, lawyers generally are afforded latitude to manage the financial affairs of their clients. Abbas took advantage of that. And he was not merely a passive participant in the financial system. He actively took steps to prevent bank investigators from detecting his fraud and from realizing that his "clients" were innocent victims—both businesses who thought they were dealing in legitimate business transactions as well as unsuspecting individuals who thought that they had found a real connection on the internet. Instead of upholding the rule of law, Abbas knowingly betrayed it.

---

[7] IC3 stands for Internet Crime Complaint Center.

[8] "Global exposed losses" refers to the dollar loss that includes both actual and attempted loss in United States dollars.

Further, this was also not an isolated crime of opportunity. Abbas engaged in a sustained pattern of criminal conduct that spanned years. Whatever misguided reasons motivated him—self-aggrandizement, or perhaps simply greed—he repeatedly chose to continue to receive fraud proceeds and launder the money. The actions he took to ensure the success of his scheme were involved and varied. Not only did he agree to serve as a director and sole shareholder of various companies—companies for which he undertook no actual business activity aside from ensuring that its bank accounts were opened to receive stolen funds—he then further transmitted those funds to other bank accounts abroad as part of a money laundering scheme. When one account was shut down, he simply opened another one. The defendant's crimes stopped because he was caught, not because he faced a crisis of conscience. These factors weigh in favor of a substantial incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1).

### B. The Defendant's History and Characteristics Weigh in Favor of the Government's Requested Sentence

The defendant's history and characteristics also underscore the need for a significant incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1). Abbas, through his background and higher legal education, has had more advantages than most defendants who appear before this Court. He reports that he had good relationships with his family members and was well provided for. *See* PSR, at ¶ 94. While poverty, addiction, and a lack of education and opportunity are not excuses for criminal behavior, they undoubtedly provide some degree of context for it in many circumstances. But they do not here. What explains the defendant's conduct is a true lack of integrity and a mistaken belief that he was above the law. The evidence presented at trial shows he understood that his gain in this scheme represented someone else's loss. This is not a case of ignorance or naivety; he knew better. Abbas also exhibits no remorse. To this day, he blames the

skill and persistence of unnamed others and, apparently, the carelessness of the victims (*see* Abbas's sentencing memorandum, Dkt. 346 at 6), but not himself.

The collateral consequences to Abbas's career and residency should not detract from the government's recommendation. Someone who uses his law license as Abbas used his should not remain a member of any bar, just as visa holders should not be permitted to leverage residence in the United States to commit transnational crimes against U.S. residents.

### C. A Sentence of 108 Months Promotes Respect for the Law, and Provides Adequate Punishment and Deterrence

The government's recommended sentence also promotes respect for the law and provides both adequate punishment and deterrence. 18 U.S.C. § 3553(a)(2). The defendant's crimes offend the rule of law. The economy depends on the integrity of the individuals who operate within it. The government cannot police every transaction that touches the financial system to ensure it is not connected to crime. Accordingly, money laundering should be punished significantly when it is detected.

The government's recommendation will also promote deterrence for those who contemplate joining the burgeoning BEC industry. BEC schemes are successful in part because they are easy to implement and are quite lucrative when successful. Logistically, scheme participants can send emails targeting thousands of potential victims each day while attempting to misdirect millions of dollars in funds. A substantial term of imprisonment is necessary to deter others who might be tempted by "easy money" from opening the domestic bank accounts that make international BEC schemes and romance fraud schemes possible. Those who use the internet to exploit the trust of unassuming businesses and innocent individuals looking for meaningful relationships online—and all those who conspire with them—should know that when they get caught, they will face serious consequences.

The First Circuit has recognized that the concept of general deterrence carries particular import in arriving at the appropriate sentence in white-collar and fraud cases. *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006). Failure to sentence Abbas to a substantial term of incarceration in this case would send the wrong message: "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

### III. CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court impose the following sentence: incarceration of 108 months, 3 years of supervised release, restitution in the amount of $2,001,853.68, forfeiture in the amount of $2,001,853.68, and a $600 special assessment.

Respectfully submitted,

RACHAEL S. ROLLINS
UNITED STATES ATTORNEY

By: */s/ Mackenzie A. Queenin*
MACKENZIE A. QUEENIN
DAVID M. HOLCOMB
ASSISTANT U.S. ATTORNEYS

Date: October 21, 2022

## CERTIFICATE OF SERVICE

    I, Mackenzie A. Queenin, certify that on this 21st day of October 2022, I caused this document to be filed via the ECF system.

*/s/ Mackenzie A. Queenin*
Mackenzie A. Queenin
Assistant U.S. Attorney

Dated: October 21, 2022